# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SUSAN T. FIGGINS,

     **Plaintiff,**

v.

                             **NO. 05-10235**

**ADVANCE AMERICA CASH ADVANCE
CENTERS OF MICHIGAN, INC., and
ADVANCE AMERICA CASH ADVANCE
CENTERS, INC.,**

     **Defendants.**

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Defendants move for summary judgment on all claims. The Plaintiff claims age, weight and sex discrimination (pregnancy) in violation of Michigan Elliott-Larsen Civil Rights Act, MCLA § 37.2202, and sex discrimination (pregnancy) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000(e). Further, Plaintiff claims that at the time of her termination, she was protected by the provision of the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, which required she be replaced in the same or similar position at the end of her medical leave.

Defendants contend that the case involves a terminable at-will employee who miscalculated the amount of FMLA leave and was properly replaced when she went past the allocated days by nearly seven weeks. Further, there is no evidence, direct or circumstantial, supporting that age, weight or sex were the real reasons for her termination. Any fact in dispute in this regard is not material to rendering a decision on this motion for summary judgment.

On April 14, 2006, pursuant to L.R. 7.1(a), Defendants' counsel and Plaintiff's counsel had a telephone conference in which Defendants' counsel explained the nature of the instant motion and its legal basis and requested but did not obtain concurrence from Plaintiff's counsel with respect to the relief sought.

A brief in support of this motion is submitted herewith together with an appendix containing relevant excerpts from the record.

Respectfully submitted,

LEWIS FISHER HENDERSON
  CLAXTON & MULROY, LLP
6410 Poplar Avenue, Suite 300
Memphis, Tennessee 38119
Telephone: (901) 767-6160
Facsimile: (901) 767-7411


By:     /s/ James R. Mulroy, II
        James R. Mulroy II
        jrmulroy@lfhc.com

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of April, 2006 I electronically filed the foregoing **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the `ECF system which will send notification of such filing to the following:

Glen N. Lenhoff, Esq.
Robert D. Kent-Bryant, Esq.
Law Office of Glen N. Lenhoff
328 South Saginaw Street
8th Floor, North Building
Flint, Michigan 48502


/s/ James R. Mulroy, II

SUSAN T. FIGGINS,

      Plaintiff,

v.                               NO.  05-10235

ADVANCE AMERICA CASH ADVANCE
CENTERS OF MICHIGAN, INC., and
ADVANCE AMERICA CASH ADVANCE
CENTERS, INC.,

      Defendants.

---

## BRIEF IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

---

## I. <u>STATEMENT OF ISSUES</u>

Plaintiff alleges she was terminated in violation of her rights under the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*. She claims the reason she was not returned to her former position were her pregnancy (sex), her weight and age. The weight and age claims are based on the Elliott-Larsen Civil Rights Act, MCLA § 37.2202. The pregnancy claim is based both on Elliott-Larson Civil Rights Act and Title VII .

## II.    <u>MOST COMPELLING AUTHORITY</u>

At-will status. *Lytle v. Malady,* 458 Mich. 153, 579 N.W.2d 906 (1998).

Weight discrimination. *Hein v. All American Plywood*, 232 F.2d 482 (6th Cir. 2000); *Farino v. Renaissance Club*, 1999 WL 33440929 (Mich. Ct. App. 1999) (copy attached).

Pregnancy discrimination. *Fleming v. Ayers & Assoc.*, 948 F.2d 993 (6th Cir. 1991).

Age discrimination. *Bhavnagri v. Henry Ford Health System*, 2004 WL 790423, *1 (Ct.App.Mich. 2004) (copy attached) (*citing Matras v. Amoco Oil Co.*, 385 N.W.2d 586 (Mich. 1986)).

FMLA status. 29 CFR 825.205(b); *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 184 (6th Cir. 1998).

## III. STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

1.     Susan Figgins was hired on October 22, 2001 as Center Manager for the LaPeer, Michigan center. (Figgins' Tr. p. 53, l. 7 - p. 54, l. 1, Ex. 1).

2.     Figgins was an at-will employee of Advance America. (Figgins' Tr. p. 134, l.16 - p. 135, l.1, Ex. 1).

3.     Figgins knew how to access Company policies in the employee handbook and had used the handbook for reference. (Figgins' Tr. p. 128, l.17 - p. 129, l. 2, p. 134, ll. 3-14, Ex. 1).

4.     Figgins' birthday is August 1, 1965.  She was 39 years old on the date of her termination. (Figgins' Tr. pp. 37, l. 25 - p. 38, l. 6, Ex. 1).

5.     Figgins is 5'4" and currently weighs 218 pounds.  During her employment she weighed 210 pounds. (Figgins' Tr. p. 60, l. 23 - p. 61, l. 4, p. 66, ll. 9-12, p. 129, ll. 11-15, Dep. Ex. 7, Ex. 1).

6.     Figgins is overweight according to U.S. Department of Health Guidelines.  (U.S. Department of Health and Human Services, Body Measurement Index, Ex. 2).[2]

---

[1]     Referred to later as "SOF" or Statement of Facts.

[2]     Judicial notice of the U.S. Department of Health Center Guidelines is requested pursuant to Fed. R. E. 201(6)(2)(f), Fed. R. E. 902(5).  Excerpts are submitted in Appendix 2 to assist in judicial notice.

7. At the time of her termination, the "Area Manager" in the same district was Pam Hazen. (Figgins' Tr. p. 103, ll.10-24, Ex. 2).

8. Hazen's date of birth is March 17, 1960 (44 years old in 2004). (FRE 1006 Summary of Business Records, Ex. 3).

9. Hazen was about the same in weight as Figgins. (Figgins' Tr. p. 104, ll.3-6, Ex. 1; Picture of Hazen, Ex. 4, P. 1).

10. Hazen was promoted from "Branch" or "Center" Manager to Area Manager by Deborah LaBeff on April 12, 2004. (FRE 1006 Summary of Business Records, Ex. 3; Declaration of D. LaBeff, ¶7, Ex. 5).

11. Figgins' former area manager was Erica Starkey (also promoted by LaBeff to that position.) Figgins admitted Starkey is "bigger than me." (Figgins' Tr. p. 104, ll. 7–8, Ex. 1; Picture of Starkey, Ex. 4, P. 2). (LaBeff Declaration, ¶5, Ex. 5; Chart Summary of Business Records, Ex. 3).

12. LaBeff, Plaintiff's manager, was 42 years old at the time of the events in question. (LaBeff Declaration, ¶ 3, Ex. 5).

13. The Regional Director of Operations was Dennis Fischer. Fischer is heavier than Figgins. (Figgins' Tr. p. 57, ll. 16-23, Ex. 1).

14. Figgins had no disputes with Fischer. She got along with him. (Figgins' Tr. p. 57, ll. 2-3, Ex. 1).

15. Donna Brewer was Figgins' assistant manager at the LaPeer Lending Center and the only other employee at the store during pertinent periods. (Figgins' Tr. p. 55, ll. 20-25, p.56, ll. 1-4, p. 74, ll. 11-12, Ex. 1; Brewer Tr. p. 8, ll. 2-4, Ex. 6).

16.     Brewer weighs 180 pounds and is 5' 3" tall. (Brewer Tr. p. 34, ll. 3-5, Ex. 1, Picture of Brewer, Ex. 4).

17.     Brewer is overweight. (U.S. Department of Health Guidelines, Ex. 2).

18.     Brewer was promoted from the position of assistant manager to manager by LaBeff on October 18, 2004. (LaBeff Declaration, ¶7, Ex. 5; Chart Summary Business Records of Hiring and Promotion in Region 13, District 2, Ex. 3).

19.     Figgins was pregnant on two occasions during her employment with the Company taking family medical leave on both occasions. (Figgins' Tr. p. 68, ll. 12-17, p. 69 ll. 9-25, p. 70, ll. 1-2, 11-25, p. 71, ll. 1-2, p. 86, ll. 10-25 p. 87, ll. 1-6, p. 93, l. 1 - p. 95, l. 5, Ex. 1).

20.     Both pregnancies were complicated by gestational diabetes. (Figgins' Tr. p. 68, 1.25 - p. 69, 1. 5, Ex. 1).

21.     As a result of the diabetes, she took insulin shots and dieted. (Figgins' Tr. p. 85, ll. 15-22, Ex. 1).

22.     Figgins did blood testing at her desk and discussed diet, diabetes and pregnancy. (Brewer Tr. p. 34, l. 19 - p. 35, l.14, Ex. 6).

23.     Figgins' first occurrence of FMLA leave began March 24, 2003, ending June 2, 2003, a total period of 10 weeks of FMLA leave. (Figgins Tr. p. 69, l. 3 - p. 70, l. 20, Ex. 1; Bates No. D000158-59 Status Change Form dated June 3, 2002, Ex. 7).

24.     Upon submitting her "release from her doctor" from her first leave, she went back to work and was assigned to a job by LaBeff, who had been promoted to Division Director of Operations. (Figgins' Tr. p. 71, l. 22 - p. 72, l. 6, p. 73, ll.5-8, Ex. 1).

25.     Figgins' second period of family medical leave occurred on April 2, 2004 with

approximately 88 hours left in FMLA leave. She had taken 9.8 weeks during the prior rolling year. (Chart Calculating Family Medical Leave, Ex. 8).

26. On April 2, 2004, her physician requested 8 hours a week off (i.e., a 32 hour week). She, in fact, worked approximately 32 hours weekly thereafter. (Figgins Tr. pp. 128, ll. 6-14, Dep. Ex. 6, Ex. 1).

27. Figgins' third request occurred on August 2, 2004. She requested full time leave for pregnancy beginning August 9, 2004. This leave was expected to extend eight weeks after the anticipated delivery date (September 28, 2004). (Figgins Tr. p. 126, ll. 6-22, Dep. Exs. 4, 5, Ex. 1).

28. In August 2004, a letter advised Figgins that she was not eligible for Family Medical Leave. (Figgins' Tr. p. 115, l. 19 - p. 116, l. 1, Dep. Ex. 2, Ex. 1).

29. This letter advised her:

> "if your medical leave continues beyond 30 days, you may be returned to your former position or a similar one, if available, when you return from leave. However, operational needs may override Advance America's ability to hold your position until you return from your leave. Therefore, Advance America cannot ensure that it will be able to return you to any position after the conclusion of your medical leave."

(Figgins Tr. Ex. 2, p. 2, Ex. 1).

30. She contacted the Department of Labor and decided that there was "no way" the leave she requested would not be covered by the FMLA. (Figgins' Tr. p. 116, ll. 2-8, Ex. 1).

31. Figgins did not count the days of intermittent leave taken prior to her request for full time leave, nor did she contact a lawyer to assist her in counting the time. (Figgins' Tr. p. 116, l. 16 - p. 118, l. 4, Ex. 1).

32. Figgins called the leave administrator who explained her calculation of leave. Figgins

5

replied "I just said, okay, thank you." She does not remember if this was after her termination. (Figgins' Tr. p. 118, ll. 10-20, p. 121, ll. 6-14, Ex. 1).

33.     Defendant calculates FMLA leave on a rolling year basis. (Defendant's Medical Leave Policy, Ex. 9).

34.     Figgins' eligibility for FMLA leave expired, at the latest, on September 25, 2004. (Declaration of Judy Brown and Charts Calculating Family Medical Leave, Ex. 8).

35.     Figgins' doctors released her to work on November 5, 2004. (Figgins' Tr. p. 101, ll. 5-9, Ex. 1).

36.     On November 8, 2005, Figgins was terminated ("no position available") upon the receipt by LaBeff of a doctor's return to work notice dated November 5, 2004. (Declaration of Judy Brown and Chart of Hiring and Promotion in Region 13, District 2 in November 2005, Ex. 3; Figgins' Tr. p. 110, l. 9 - p. 111, l. 9, Ex. 3).

37.     Figgins believes that LaBeff's animosity toward her stemmed from an incident occurring prior to Figgins' pregnancy, in which Figgins asked a question concerning credit file folders. LaBeff turned "beet red" since she had provided advice to Plaintiff which was not in accord with the policy recited by the instructor. Figgins testified "we never talked about it, Deborah and I. I just felt she didn't really care too much for me after that." (Figgins' Tr. p. 73, l. 11 - p. 75, l. 5, Ex. 1).

38.     Afterward, LaBeff would "undermine" her in front of her subordinates, "make me feel small." "If there was a file with an error in it and it was mine, she would you know make me feel small. . ." This was in the context of "operational" or "business" issues. (Figgins' Tr. p. 76, l. 17 - p. 77, l. 16, Ex. 1).

6

39.     Figgins was always afraid "that because of the threatening and intimidating" that LaBeff was going to fire her. (Figgins' Tr. p. 147, ll. 16-21, Ex. 1).

40.     During Plaintiff's pregnancy, LaBeff surprised Figgins and her assistant, Brewer, while eating breakfast from McDonald's rather than opening the center which opened one half hour late. (Brewer Tr. p. 19, ll. 5-24, Ex. 6, LaBeff Tr. pp. 69, ll. 18-25, p. 70, ll. 1-25, p. 71, ll. 1-4, Ex. 10).

41.     LaBeff took exception to the number of breaks Plaintiff took during the day. Company policy allowed one break in the morning before lunch and one break after lunch. Figgins and her assistant took four breaks a day to smoke. (Brewer Tr. p. 36, ll. 6-14, Ex. 6, LaBeff Tr. pp. 72, l. 12 - p. 73, l. 19, Ex. 10).

42.     LaBeff complained that Figgins did not comply with the dress code and doubted Figgins' truthfulness with her. (LaBeff Tr. pp. 94, ll. 23-25, 95, ll. 1-7, 151, ll. 3-25, Ex. 10).

43.     Plaintiff was terminated on November 8, 2004. In their last conversation, LaBeff advised her that there was nothing available but that "if something became available she would call me." (Figgins' Tr. p. 110, ll. 20-25, p. 111, ll. 1-10, 17-19, Ex. 1).

44.     Figgins called and emailed Regional Director, Dennis Fischer. In the email dated December 6, 2004, Figgins stated to Fischer in regard to LaBeff's motives in terminating her:

> . . .I felt this was a personal vendetta against me, that Deborah had it in for me for a long time, that I really like my job. I really needed my job. I really would like to come back. Most of it, I guess, was based on how unfair I felt she was to me and other people in the company.

(Figgins' Tr. pp. 112, ll. 1-7, 113, ll. 1-5, Ex. 1).

45.     Figgins recounted to Fisher two years of disagreements with LaBeff, but does not

7

mention discrimination on the basis of age, weight or pregnancy. (Email of December 6, 2004 with

Declaration of Dennis Fischer, Ex. 11).

46.    In this correspondence, she attributed her termination to the following:

> I don't know if it is because she has a personal vendetta against me, or if it is that I make too much money and she can hire someone for less or maybe the company doesn't want me back because I've had two babies and used too much insurance money, if that's the case, my tubes are tied. Ha ha.

(Email of December 6, 2004, Ex. 11).

47.    Figgins' resolution was to restructure the Region so she would not be managed by

LaBeff. (Email of December 6, 2004, Ex. 11).

48.    Figgins testified that LaBeff said in regard to weight:

> A:    Yes, more than a dozen times she said you need to watch your weight, you need to watch what you eat. What did you have for lunch. You shouldn't eat that.
>
> Q:    And that was – all occurred after you became pregnant?
>
> A:    Yes.

(Figgins' Tr. p. 165, ll. 20-25, Ex. 1).

49.    In regard to age discrimination, Plaintiff stated the following:

> Q:    Okay. Deborah LaBeff frequently made negative comments about plaintiff's age. Tell me about that.
>
> A:    Again, all three go hand in hand. With your age, with your weight and being pregnant you're going to be off work. You need to watch what you eat. It all just went hand in hand.

(Figgins' Tr. p. 166, ll. 15-17, Ex. 1).

50.    Plaintiff knows people who were allowed to go on pregnancy leave and  allowed to

return to prior positions but hers "was the first second pregnancy and I feel Deborah was out to get me." She knew of no other second pregnancies. (Figgins' Tr. p. 168, ll. 5-6, Ex. 1).

51.	LaBeff assigned Christina MacKenzie to the Lapeer store on October 12, 2004. MacKenzie currently holds that position. (MacKenzie Tr. p. 6, ll. 5-7, Ex. 12; LaBeff Tr. p. 133, ll. 9-10, Ex. 10; Summary of Business Records, Ex. 3).

52.	MacKenzie is 5'3" and weighs 176 pounds. (MacKenzie Tr. p. 9, ll. 17-23, Ex. 12).

53.	McKenzie is overweight. (U.S. Department of Health and Human Services Body Measurement Index, Ex. 2).

54.	In 2004 and 2005, LaBeff hired 9 people within 5 years of Figgins' age. This included six individuals who were older than Plaintiff at the time of her termination. (Summary of Business Records, Ex. 3; LaBeff Declaration, ¶6, Ex. 5).

55.	In 2004 and 2005, LaBeff promoted at least five individuals to branch managers or area managers near in age or older than Plaintiff. (Summary of Business Records, Ex. 3, LaBeff Declaration, ¶ 6, Ex. 5).

56.	Pictures of the employees in the division managed by LaBeff demonstrate people of various shapes and sizes work in that Division. (Photographs of Division Employees, Ex. 4).

57.	LaBeff gave Figgins awards and she received "good" performance reviews from LaBeff. (Figgins Tr. p. 133, 11. 5-18, Ex. 1).

58.	The comments by LaBeff concerning pregnancy, weight and age occurred between January and August 2004. (Figgins' Tr. p. 81, ll. 13-18, Ex. 1).

60.	Rogers never heard LaBeff make any derogatory statements in regard to Figgins' weight, age or condition of pregnancy during the eight months she was in contact with LaBeff

discussing Figgins' medical leave nor did she consider such in calculating leave. (Rogers' Tr. p. 48, ll. 4-20, p. 49, ll. 3-25, Ex. 13).

61. Rogers dealt with LaBeff on other cases, including those involving pregnancy. She found LaBeff to treat her employees fairly. (Rogers' Tr. p. 47, ll. 17-22, Ex. 13).

62. Men as well as women are provided medical benefits for their children and for the delivery of their children. (Authenticating Declaration of Judy Brown with attached Advance America Medical Leave Policies, Ex. 9).

63. As Division Director, LaBeff hired 19 employees ranging from age 19 to 55. Five of these were as old or older than Figgins. (Authenticating Declaration of Judy Brown with attached Business Records Summary, Ex. 3).

64. At the time of Figgins' attempted return on or about November 9, 2004, LaBeff had filled all manager positions. One was filled by a manager who would return in December from Family Medical Leave (a pregnancy leave). (Business Records Summary, Ex. 3; LaBeff Declaration, ¶ 9, Ex. 5).

## IV. ARGUMENT

### A. Plaintiff was a terminable at-will employee.

Plaintiff acknowledges that she was an at-will employee of Advance America. (SOF 2).

An employee at-will may be terminated "at any time and for no reason; the employer can do so arbitrarily and capriciously." *See, for example, Bracco v. Michigan Technology University,* 454 Mich. App. 912, 588 N.W.2d 467 (1998), *citing Rood v. General Dynamics Corp.,* 444 Mich. 107, 116, 507 N.W.2d 591 (1993).

Figgins testified that bad feelings existed with LaBeff before she became pregnant and before

the time LaBeff became one of her managers. Figgins believed that as a result of that conflict, she would be terminated. (SOF 37, 38, 39). Figgins advised Fischer, LaBeff's supervisor, in a letter after the termination that she believed that the termination was due to this personnel vendetta. (SOF 44, 45, 46).

LaBeff had complaints about Plaintiff. She complained that Plaintiff had allowed the store to remain closed while she (Figgins) and Donna Brewer ate fast food, that she was not truthful with her and that Plaintiff and her assistant took too many breaks to smoke. (SOF 40, 41, 42).

LaBeff's reasons for terminating Plaintiff need not be well taken. However, the reasons cannot be in violation of an explicit legislative statement, the refusal to violate a law or for exercising a right conferred by statute. *Eldberg v. LECO Corporation,* 236 Mich. App. 177, 180-181, 599 N.W.2d 785, 786-87 (1997).

According to Figgins, the "vendetta" began as a result of a perceived slight. Such a reason does not fit within any of these exceptions to the at-will doctrine. Figgins' position is very similar to the circumstances addressed by the Michigan Supreme Court in *Lytle v. Malady*, 458 Mich. 153, 182, 579 N.W.2d 906, 918 (1998)[3], in which summary judgment was granted where a plaintiff provided evidence only to "reasonably suggest that she and her supervisor had a personality conflict" which arose when she refused to wear a dress to a company outing.

## B. Plaintiff Cannot Establish Weight Discrimination.

### 1. Plaintiff cannot prove weight discrimination by circumstantial evidence.

To establish a case of intentional weight discrimination using circumstantial evidence,

---

[3] A case in which summary judgment was granted by the trial court, reversed by the Court of Appeals but reinstated by the Michigan Supreme Court.

Plaintiff must establish: (a) that she is a member of a statutorily protected class; (b) that she was qualified for the job; (c) that she was discharged from the job; and (d) that she was replaced by someone outside the protected group. *Penzato v. Continental Cablevision,* 1996 WL 33324109 (Mich. Ct. App. 1996) (copy attached), *citing Featherly v. Teledyne Industries, Inc.,* 194 Mich. App. 352, 358; 486 N.W.2d 361 (1992).

Elliott-Larsen does not define "overweight." However, the U.S. Department of Health has defined such a class. Under DOH criteria, Plaintiff is overweight. (SOF 6 and Footnote 2 thereto). However, Plaintiff must also establish that she was replaced by someone outside the protected class. Plaintiff cannot do so.

Until November 5, 2004, Figgins was totally disabled from working and, thus, not "qualified" for the job. (SOF 35). When her physician issued a return to work form on November 5, 2006, the store which she formerly managed had been assigned on October 12, 2004 to Christina MacKenzie. (SOF 51). MacKenzie is "overweight" according to U.S. Government standards. (SOF 52, 53). Figgins was not replaced by someone outside the protected classification. In addition, Figgins' former Assistant Manager, Donna Brewer, was placed in a manager position by LaBeff on October 18, 2004, three weeks before the Figgins was qualified to return to work. (SOF 18, 35). Brewer is likewise within the protected classification. (SOF 16, 17).

Figgins acknowledged that both her Area Managers, Hazen, and her former Area Manager, Starkey, were as heavy as she and that LaBeff's supervisor, Fischer was heavier. (SOF 9, 13). Starkey was promoted by LaBeff, as was Hazen. (SOF 10, 11). The allegation that LaBeff or Fischer held a discriminatory animus toward overweight individuals is thus inconsistent with the facts.

12

2.      Plaintiff Cannot Establish Weight Discrimination by Direct Evidence.

Figgins contends that statements made by LaBeff concerning Plaintiff's eating habits and weight are direct evidence of LaBeff's discriminatory animus claiming LaBeff made comments about Figgins' eating habits, age and weight in reference to her pregnancy. (SOF 48, 49, 58).

The Michigan Court of Appeals held that in determining whether comments concerning weight are evidence of weight discrimination, the context of the statements must be considered. Comments expressing concern for an individual's overall health are not hostile remarks and are not evidence of weight based discrimination. *Farino v. Renaissance Club*, 1999 WL 33440929 (Mich. Ct. App. 1999), citing *Lamoria v. Health Care and Retirement Corp.,* 233 Mich. App. 560, 584 N.W.2d 589, Fn. 8 (Mich. App. 1998).

Figgins had gestational diabetes. She was open about her diet and her need to take insulin. (SOF 19, 20, 21, 22). It was known she had an "at risk pregnancy" for which she was granted time off. (SOF 19, 26, 27). She continued to take breaks to smoke cigarettes and eat fast food. (SOF 40, 41).

In *Lamoria v. Health Care and Retirement Corp.,* 230 Mich. App. 801, 810, Fn. 8, 584 N.W.2d 589 (1998), the Michigan Appeals Court stated:

> [W]e would not expect trial courts faced with motions for summary disposition on claims of weight discrimination to ignore real differences between the characteristics of race and weight. It is common knowledge that many health professionals advise against being 'overweight.' Accordingly, comments that could reasonably be taken as mere advice about diets and the like do not amount to expressions of animus sufficient to indicate a likelihood that one would engage in illegal weight discrimination."

Additionally, the evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of age, but also that the employer acted on that

13

predisposition. *Downey v. Charlevoix County Bd. Of Rd. Comm'rs,* 227 Mich. App. 621, 576 N.W.2d 712, 717-18 (1998)

In *Hein v All America Plywood Co., Inc.,* 232 F.3d 482, 488 (6th Cir. 2000), separate pictures ridiculed plaintiff's weight, a cartoon which contained a reclining Big Boy from the Big Boy restaurant chain with a caption about the plaintiff and a picture of a gorilla containing a caption about the plaintiff. *Id* at 485. The Sixth Circuit held that these incidents occurred more than five months before the plaintiff was terminated. Therefore, they were not evidence that plaintiff was terminated as a result of weight discrimination. *Id.* at 489.

Likewise, in *Farino,* the comment that Plaintiff was "fat and stunk" made a year earlier was "unrelated to the decisional process" and "insufficient" to demonstrate the decision maker relied on illegitimate criteria. *Farino* at *2 (granting judgment NOV).

Here, no weight slurs alleged by Plaintiff which are as egregious as those considered by the courts in *Farino* and *Hein*. When taken in context, they reflect LaBeff commenting on Plaintiff's health and concerns for the health of Figgins' unborn child. No alleged slurs or derogatory comments were recounted by Figgins for the period after she took full time leave on August 9, 2004. (SOF 59). The leave administrator testified that between April 2004 and October 2004, LaBeff made no weight, age or pregnancy related slurs. In prior dealings with LaBeff, she always appeared to be fair to employees. (SOF 60, 61).

Moreover, there is no evidence that overweight females were disparaged, disciplined or terminated or treated differently due to their weight. Plaintiff affirmed she was provided "good" evaluations by LaBeff and received awards and bonuses from LaBeff. (SOF 67). Individuals as heavy and heavier than Figgins were hired and promoted by LaBeff. (SOF 10, 11, 17, 18, 53, 56).

**C.    Figgins Is Unable to Establish Pregnancy Discrimination.**

1.    Figgins cannot establish pregnancy discrimination by circumstantial evidence.

The elements of proving a circumstantial case of pregnancy discrimination in terminating an employee are similar to those of proving weight discrimination. That is, she must establish: (a) she was pregnant; (b) she was qualified for her job; (c) she was subjected to an adverse employment decision because of her pregnancy; and (d) there is a causal connection between her pregnancy and the adverse employment decision. *Prebilich-Holland v. Gaylord Entertainment Company*, 297 F.3d 438 (6th Cir. 2002).

Figgins was not terminated when she was pregnant. She had delivered a month earlier and had received her physician's approval to return to work full time.

Figgins had been allowed a period of FMLA leave for pregnancy in 2003 and was reinstated by LaBeff upon her return from leave. (SOF 24). She acknowledges she was allowed to work a thirty-two hour week for a period of four months while she was the manager of the LaPeer Center (SOF 26) and that other managers were allowed to return to their jobs after periods of FMLA pregnancy leave. (SOF 50).

In the letter to Fischer, she speculates that the reason she was terminated was possibly "because she had two babies and used too much insurance money" but "that her tubes were tied." (SOF 44, 45, 46, 50). The Sixth Circuit addressed such allegations in *Fleming v. Ayers & Assoc.*, 948 F.2d 993 (6th Cir. 1991). The court held that to make a case for pregnancy discrimination, a woman must link the alleged discrimination to gender. The court found that men could not make a claim of pregnancy discrimination. The court stated in upholding the District Court's grant of summary judgment:

15

. . .Fleming has not demonstrated that Ayers' decision has any linkage whatsoever to gender. Ayers' reluctance to employ Fleming was based upon the costs associated with providing expensive ongoing medical care for her child, which reluctance was unrelated to the fact that Fleming is a woman. . .

948 F.2d 993, 997. (Emphasis added).

Under the Company medical plan, payments for pregnancy related expenses are not limited to female employees and are not "gender specific." Male employees are also covered for care of family members. (SOF 62). Thus, speculation that her termination was a result of a desire to avoid paying medical expenses, even if true, is sex neutral.

2.    Direct evidence of pregnancy discrimination.

Plaintiff alleges that the evidence of pregnancy, age and weight discrimination are interrelated. (SOF 48, 49). Age, weight and diet are related to health risks to mother and child during pregnancy, and comments on such issues should not be considered slurs or evidence of discriminatory animus. *See Lamoria* at fn.8.

Nor do other facts circumstantially support pregnancy discrimination. For example, Figgins could not identify a single other employee allowed to go on medical leave for pregnancy but who was not allowed to return to employment with the Company. (SOF 50).

**D.    Figgins Cannot Establish That She was Terminated on the Basis of Her Age.**

1.    Circumstantial proof of discrimination.

As an element of her age case, Figgins alleges that she was replaced by a younger employee. (Plaintiff's Complaint, ¶ 26). However, "[E]vidence that a younger employee was retained when a competent older employee was terminated is insufficient to establish a *prima facie* case of age discrimination.") *See, Bhavnagri v. Henry Ford Health System,* 2004 WL 790423, *1 (Ct.App.Mich.

2004) (*citing Matras v. Amoco Oil Co.*, 385 N.W.2d 586 (Mich. 1986)) (copy attached). Younger employees often replace older employees for non-discriminatory reasons, the fact that an older employee was replaced by a younger employee is not enough to create an inference of discrimination. *Monaco v. Fuddruckers, Inc.*, 1 F.3d 658, 661 (7th Cir. 1993).

The evidence shows that from June 2004 to June 2005, LaBeff hired 19 employees. (SOF 63). These employees' ages range from 19 to 55, and at least five of these employees were as old or older than Plaintiff. (SOF 54, 55). In fact, LaBeff employed employees of all ages. (SOF 54, 55, 63).

      2.    There is no direct evidence of age discrimination.

There is no connection drawn by Figgins between any alleged comments and the ultimate decision to terminate. There are no age remarks reported made near in time to the decision. (SOF 58, 60, 61). The records demonstrate that LaBeff was not more prone to terminate or discipline older women.

**E.    Defendant Has Enunciated Legitimate Non-Discriminatory Reasons for Termination.**

In the event that the Court determines that Figgins has met her burden of proving a *prima facie* case of discrimination on one or more issue, "the burden shifts to the [employer] 'to articulate some legitimate, nondiscriminatory reason for [its employment action].'" *McDonnell Douglas*, 411 U.S. at 802. If the employer carries its burden, the burden shifts back to the employee to prove that the articulated justifications for the employment action are merely pretexts for discrimination. *Id.* The employee can show pretext by demonstrating that the nondiscriminatory reasons offered for the employment action (1) have no basis in fact; (2) did not really motivate the employment action; or (3) were insufficient to justify the employment action. *Manzer v. Diamond Shamrock Chems. Co.,*

29 F.3d 1078, 1084 (6th Cir. 1994). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff," *Burdine*, 450 U.S. at 253.[4]

LaBeff advised Figgins that all positions were filled but that she would be considered for other open positions. (SOF 43). Figgins' FMLA eligibility had expired and she was absent under Defendant's general medical leave policy and she was advised of this before she took leave. (SOF 29, 33, 34, 35).

Plaintiff was replaced under the Company's non-FMLA medical leave policy, an action within LaBeff's discretion. (SOF 29) Figgins contends that this was due to the vendetta held by LaBeff towards her. (SOF 37, 38, 39). While LaBeff did not agree that there was a "vendetta," she concurred that she did find problems with the way Figgins conducted herself. (SOF 41, 42, 45).

In this case, there is evidence both that (a) the positions were filled at the time of Plaintiff's return; and (b) the immediate supervisor (LaBeff) was unhappy with Figgins' performance. These are not mutually exclusive or contradictory positions. They are complementary. An employer is more likely to hold a position open for a desirable employee. In conjunction or separately, these reasons constitute legitimate business reasons for termination which are unrebutted.

**F.    Defendant Did Not Violate the FMLA by Failing to Reemploy Plaintiff.**

"The FMLA provides that 'an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period' because of a serious medical condition making the employee unable to work." *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 184 (6th Cir.

---

[4]    Under the Elliott-Larsen Act, the Plaintiff must not only prove that the legitimate reason was pretext but also prove that the proffered reason is pretext for discrimination. *Hopson v. DaimlerChrysler Corp.,* 306 F.3d 427, 438 (6th Cir. 2002) (emphasis added).

18

1998) (*citing* 29 U.S.C. § 2612(a)(1)(D)). If the employee is unable to return to work after the 12 work weeks of leave is exhausted, the employer has no obligation to reinstate the employee. *See Cehrs*, 155 F.3d at 784-85. In fact, "an employer does not violate the FMLA by terminating an employee, even prior to the end of the statutory twelve-week leave period, if the employee 'was clearly unable to return to work within the period provided by the FMLA.'" *Chrisman v. Rapid-Line, Inc.*, 2005 WL1460291, *2 (W.D.Mich. 2005) (copy attached) (*citing Cehrs*, 155 F.3d at 785).

In the instant case, the Company elected the rolling year method of counting leave pursuant to 29 C.F.R. 825.205(b). The example provided by this provision states:

> Under. . .the "rolling" 12-month period, each time an employee takes FMLA leave, the remaining leave entitlement would be any balance of the 12 weeks which has not been used during the immediately preceding 12 months. For example, if an employee has taken eight weeks of leave during the past 12 months, an additional four weeks of leave could be taken.

As demonstrated by the calendars and analysis contained in Exhibit 8, on August 9, 2004 Figgins had 7 weeks of FMLA remaining. Her FMLA leave expired on September 25, 2004. At the time Figgins submitted the return to work notice, she had exceeded her FMLA leave by approximately seven weeks. The fallacy in Figgins' calculation of leave is that she had not calculated the period of intermittent FMLA leave she had incurred in April through July of 2004. She merely calculated the leave beginning on August 9, 2004. (SOF 30, 31). Any contention that Plaintiff could have received an earlier return to work form, if she had properly accounted for the leave, is refuted by two facts. Figgins' doctor's original request for leave submitted in August 2004 placed Figgins' expiration of leave at a point eight (8) weeks beyond her expected delivery date and in fact released on November 5, 2004. (SOF 35). This was well after her FMLA leave expired. In other such

19

circumstances, the argument that Plaintiff could have, but did not, submit a return to work form, and Figgins apparently contends, has been rejected and Figgins. *Barnes v. Ethan Allen*, 356 F.Supp.2d 1306 (S.D. Fla. 2005), *aff'd* 149 Fed. Apx. 845 (11th Cir. 2005)(copy attached).

Respectfully submitted,

LEWIS FISHER HENDERSON
CLAXTON & MULROY, LLP
6410 Poplar Avenue, Suite 300
Memphis, Tennessee 38119
Telephone: (901) 767-6160
Facsimile: (901) 767-7411

By:    /s/ James R. Mulroy, II
       James R. Mulroy II
       jrmulroy@lfhc.com

**ATTORNEYS FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of April, 2006 I electronically filed the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Glen N. Lenhoff, Esq.
Robert D. Kent-Bryant, Esq.
Law Office of Glen N. Lenhoff
328 South Saginaw Street
8th Floor, North Building
Flint, Michigan 48502

/s/ James R. Mulroy, II




Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Appeals of Michigan.
Christine FARINO, Plaintiff-Appellee,
v.
Renaissance CLUB and John Guy, Defendants-
Appellants.
**No. 206031.**

June 29, 1999.

Before: DOCTOROFF, P.J., and MARKMAN and
J.B. SULLIVAN [FN*], JJ.

    FN* Former Court of Appeals judge, sitting
on the Court of Appeals by assignment.

PER CURIAM.

**\*1** In this obesity discrimination action, defendants
appeal as of right from a judgment, following a jury
trial, awarding plaintiff $275,191.50, and denying
defendants' motion for judgment notwithstanding the
verdict (JNOV), new trial, or remittitur. We reverse.

Plaintiff, who at all relevant times was overweight,
was hired by defendant Renaissance Club (RC) as an
accounting clerk. Defendant Guy, RC's manager,
later hired plaintiff as a club secretary. When plaintiff
returned from medical leave, Guy transferred her to
the position of day receptionist, where she remained
for sixteen months. Because of plaintiff's lackluster
performance and members' complaints, and at the
recommendation of relatives of plaintiff's, Guy later
transferred her to the position of night receptionist.
Plaintiff did not want to work the later shift and
stated that she would quit once she found another job.
When plaintiff refused to set a firm date for her
departure after several requests for such a date, Guy
did so himself. Plaintiff claims that Guy's action
constituted an involuntary termination of her
employment and was motivated by a discriminatory
animus based on her weight in violation of M.C.L. §
37.2202(1)(a); MSA 3.548(202)(1)(a).

Assuming, without deciding, that the trial court

properly submitted the question whether plaintiff left
RC's employ voluntarily or involuntarily to the trier
of fact, see *Middleton v Arkansas Employment
Security Div'n,* 265 Ark 11, 13-14; 576 S.W.2d 218
(1979), we find that trial court nonetheless erred in
denying defendants' motion for JNOV because
plaintiff failed to make out even a prima facie case of
discrimination. "In reviewing a motion for JNOV,
this Court views all evidence in a light most
favorable to the nonmoving party." *Severn v. Sperry
Corp,* 212 Mich.App 406, 412; 538 NW2d 50 (1995).
"Only if the evidence so viewed fails to establish a
claim as a matter of law, should a motion for [JNOV]
be granted." *Nabozny v Pioneer State Mutual Ins Co,*
233 Mich.App 206, 209-10; 591 NW2d 685 (1998).
If, however, reasonable jurors could honestly have
reached different conclusions, the jury verdict must
be allowed to stand. *Severn, supra* at 412.

A prima facie case of discrimination can be
established by proof of intentional discrimination or
disparate treatment. *Coleman-Nichols v. Tixon Corp,*
203 Mich.App 645, 651; 513 NW2d 441 (1994). To
establish a disparate treatment claim, the plaintiff
must prove that she was a member of a protected
class and that she was treated differently than persons
of a different class for the same or similar conduct or
performance. *Id.; Reisman v Regents of Wayne State
Univ,* 188 Mich.App 526, 538; 470 NW2d 678
(1991). The plaintiff's weight need not be the only
reason, or even the main reason, for the adverse
employment decision, but it does have to be a
motivating factor. Cf. *Reisman, supra* at 539;
*Lamoria v Health Care and Retirement Corp,* 233
Mich.App 560; ___ NW2d ___ (1999), adopting 230
Mich.App 801, 808-09; 584 NW2d 589
(1998)(*Lamoria* I). To be similarly situated, "all of
the relevant aspects" of plaintiff's employment
situation must be "nearly identical" to those of the
employee(s) with whom she compares herself. *Town
v. Michigan Bell Telephone Co,* 455 Mich. 688, 699-
700; 568 NW2d 64 (1997) (Brickley, J). See also
*Mitchell v. Toledo Hospital,* 964 F.2d 577, 583 (CA
6, 1992).

**\*2** Plaintiff here sought to compare herself with
Rosie Moncivais, an average-weight woman who
also worked as a receptionist and reported to the
same supervisors. Plaintiff, who admittedly did not
like dealing with the public, was the subject of
several complaints by members regarding the way

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

she treated them. Although Moncivais' performance review indicated that she had a negative attitude, it also noted that she "displays a desire to be of service." Unlike in plaintiff's case, there was no mention of member complaints regarding Moncivais' attitude. Nevertheless, Moncivais was transferred to the night shift because of performance problems, just as plaintiff was. She accepted the transfer, whereas plaintiff objected to it and stated that she intended to leave imminently if she were not returned to the day shift. Thus the evidence shows that plaintiff and Moncivais were *not* similarly situated in terms of their performance problems, yet *were* treated the same, i.e. transferred to the night shift. Once on the night shift, plaintiff and Moncivais were not similarly situated because Moncivais accepted the change whereas plaintiff did not and indicated her intent to quit. It was that threat that led eventually to the termination of her employment. There was no evidence that Moncivais (or any other employee) made a similar threat but was not ultimately discharged. To the contrary, Moncivais was urged to quit but refused. Therefore, plaintiff has failed to establish discrimination as the result of disparate treatment. [FN1]

FN1. We assume for the purpose of the instant analysis that, although indicating her intention to resign at some indeterminate time, plaintiff was involuntarily discharged here because her final working date was eventually imposed upon her by defendant. However, it is hardly clear that, once an employee has announced his or her intention to quit a position, that an employer must invariably allow the employee to determine the specific departure date at the risk of being responsible for the employee's 'firing.' See *Schultz v. Oakland Co,* 187 Mich.App 96, 102; 466 NW2d 374 (1991); *Middleton v Arkansas Employment Security Div'n,* 265 Ark 11; 576 S.W.2d 218 (1979). It is not difficult to envision potential morale or dissension problems that may arise where an employer is compelled to await a lame-duck employee's decision on a final working date.

To prove purposeful discrimination, the plaintiff "must show that she was a member of a protected class, that she was discharged or otherwise discriminated against with respect to employment, that the defendant was predisposed to discriminate against persons in the class, and that the defendant acted upon that disposition when the employment decision was made." *Coleman-Nichols, supra.* In a

case involving direct evidence of discrimination, the plaintiff bears the burden of proving both the discriminatory animus and its causal nexus to the challenged employment decision. *Harrison v. Olde Financial Corp,* 225 Mich.App 601, 612-13; 572 NW2d 679 (1997). "While the continuous use of racial or ethnic slurs may be sufficient for finding liability for discrimination, occasional or sporadic instances of such conduct are insufficient." *Sargent v International Bhd of Teamsters,* 713 F Supp 999, 1017 (WD Mich, 1989). In *Hong v. Children's Memorial Hosp,* 993 F.2d 1257, 1266 (CA 7, 1993), the court stated:

Evidence of a supervisor's occasional or sporadic use of a slur directed at an employee's race, ethnicity, or national origin is generally not enough to support a claim under Title VII. We have held that such remarks, when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements were uttered by a decision maker. [Citations and footnote omitted.]

*3 Thus, absent evidence that "the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discriminatory discharge." *McCarthy v. Kemper Life Ins Cos,* 924 F.2d 683, 686-87 (CA 7, 1991).

The evidence against Guy, taken in a light most favorable to plaintiff, includes the following: (1) in 1988 and 1989--at least four or five years prior to plaintiff's termination in April 1993--while plaintiff was still club secretary, Guy noted a concern in her performance reviews about plaintiff's weight. The remarks, which were made in the context of a concern for plaintiff's overall health, were not hostile or derogatory and, in our judgment, are not evidence of a weight-based animus. *Lamoria 1, supra* at 810 n 8; [FN2] (2) at unspecified times, although apparently at least one year prior to plaintiff's departure, an instance occurred in which Guy imitated the sight and sound of plaintiff's walk in a common area, causing other employees to laugh; and (3) at an unspecified time, although apparently at least one year prior to plaintiff's departure, Guy remarked that plaintiff was fat and stunk. The act of imitating plaintiff's walk, and the remark that she was fat and stunk were indeed derogatory and thus may be considered evidence of weight-based animus. *Lamoria, supra,* at 810. However, they predated plaintiff's termination by at least a year or more; they did not indicate any aversion to employing overweight people or any intention to terminate plaintiff's employment; and they were not made in reference to any employment decision. In our

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

judgment, these were entirely isolated and stray remarks, wholly unrelated to the employment process. In particular, we again emphasize that Guy never raised the issue of terminating plaintiff's employment until she affirmatively announced her intention to quit.

> FN2. "[W]e would not expect trial courts faced with motions for summary disposition on claims of weight discrimination to ignore real differences between the characteristics of race and weight. Race is basically an immutable characteristic; being of a particular race is not a negative attribute. In contrast, weight is an aspect of oneself that is subject to some control by one's conduct. It is common knowledge that many health professionals advise against being 'overweight.' Accordingly, comments that could reasonably be taken as mere advice about diets and the like do not amount to expressions of animus sufficient to indicate a likelihood that one would engage in illegal weight discrimination."

In conjunction with these occurrences, we also have the following facts in evidence: (1) plaintiff was placed in two responsible positions by Guy, including one as his personal secretary, when she weighed at least 300 pounds; (2) Guy employed three former receptionists whose weight was apparently comparable to that of plaintiff; (3) Guy demonstrated considerable kindness and respect toward plaintiff on several occasions, including during difficult periods of medical care and treatment of plaintiff; and (4) despite considerable evidence that plaintiff was not performing her job at the highest standards, including statements from plaintiff herself that she did not enjoy dealing with the public, Guy never sought to terminate plaintiff and only imposed a final work date upon her after she indicated her intention to leave but repeatedly refused to supply a final work date on her own.

We conclude that the evidence here was insufficient as a matter of law to enable a rational trier of fact to find that Guy or the RC acted with a discriminatory animus in terminating plaintiff's employment and, therefore, that the trial court erred in denying defendants' motion for JNOV. [FN3]

> FN3. Because of our decision, it is unnecessary to deal with defendants' contentions that the trial court reversibly erred in allowing one witness to testify

about alleged anti-union efforts on the part of defendants not involving plaintiff; in refusing to allow defendants to cross-examine that same witness through the use of her personnel file; in refusing to allow the admission of classified ad evidence concerning employment opportunities in the Detroit area; and in refusing to instruct the jury on the issue of mitigating damages.

\*4 Reversed.

Not Reported in N.W.2d, 1999 WL 33440929 (Mich.App.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



---





Not Reported in N.W.2d
Not Reported in N.W.2d, 2004 WL 790423 (Mich.App.)
**(Cite as: 2004 WL 790423 (Mich.App.))**

Page 1 

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Appeals of Michigan.
Jamshid BHAVNAGRI, M.D., Plaintiff-Appellant,
v.
HENRY FORD HEALTH SYSTEM, Defendant-Appellee.
No. 245538.

April 13, 2004.

Before: TALBOT, P.J., and NEFF and DONOFRIO, JJ.

[UNPUBLISHED]

PER CURIAM.

*1 Plaintiff appeals as of right the trial court's order granting defendant's motion for summary disposition in this employment discrimination action. On appeal, plaintiff argues the trial court erred in granting summary disposition because genuine issues of material fact existed concerning his age and national origin discrimination claims and that defendant's arguments failed to refute plaintiff's evidence of discrimination. Because the evidence does not support plaintiff's claims, we affirm.

Plaintiff brought this discrimination action under the Civil Rights Act (CRA), MCL 37.2101 et seq. Plaintiff is a physician of Indian descent, and at the time of his termination from employment by defendant, was aged fifty-four. Plaintiff contends that defendant discriminated against him in violation of the CRA by terminating his employment and retaining a younger, non-Indian physician during a workforce reduction.

We review de novo a trial court's ruling on a motion for summary disposition. Spiek v. Michigan Dept of Transp, 456 Mich. 331, 337; 572 NW2d 201 (1998). MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. Id. The court considers the affidavits, pleadings, depositions, admissions, and other documentary evidence submitted or filed in the action to determine whether a genuine issue of any material fact exists to warrant a trial. Id.

Pursuant to the CRA,

An employer shall not do any of the following:
Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status. [MCL 37.2202(1)(a).]
To establish a prima facie case of discrimination, a plaintiff must prove that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) others, similarly situated and outside the protected class, were unaffected by the employer's adverse conduct. Town v. Michigan Bell Telephone Co, 455 Mich. 688, 695; 568 NW2d 64 (1997). Although an employer may not conduct economically necessary layoffs for illegal reasons, such as unlawful discrimination, evidence that a younger employee was retained when a competent older employee was terminated is insufficient to establish a prima facie case of age discrimination. Matras v. Amoco Oil Co, 424 Mich. 675, 684; 385 NW2d 586 (1986); Featherly v. Teledyne Industries, Inc, 194 Mich.App 352, 355; 486 NW2d 361 (1992). An employee is required to present sufficient evidence on the ultimate question of whether age or national origin were determining factors in the decision to discharge the plaintiff. Matras, supra, 424 Mich. 684.

There is no dispute that plaintiff is a member of a protected class, that he suffered an adverse employment action, and that he was qualified for his position. Plaintiff maintains that he was similarly situated to Dr. Peter Drenchko, a younger non-Indian physician who was unaffected by the layoffs. Drenchko was aged forty-six at the time of the layoffs. To create an inference of disparate treatment, plaintiff must prove that "all of the relevant aspects" of his employment situation were "nearly identical" to those of Drenchko's employment situation. Town, supra, 455 Mich. 699-700. Although Drenchko saw patients, Drenchko was division head. Plaintiff reported to Drenchko, and Drenchko conducted plaintiff's performance reviews. After reviewing the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence, we find that plaintiff failed to present evidence illustrating that all of the relevant aspects of his position were nearly identical to those of Drenchko. We therefore conclude that plaintiff and Drenchko were not similarly situated and plaintiff has not created an inference of disparate treatment. *Id.*

*\*2* Furthermore, Dr. Bruce Muma hired plaintiff in 1996 and made the decision to terminate him during the workforce reduction in 2001. This creates an inference that plaintiff's age and national origin were not determining factors in Muma's decision because it is unlikely that Muma developed an aversion to fifty-four year-old people of Indian national origin during the five years plaintiff worked for defendant. *Town, supra,* 455 Mich. 701.

Michigan courts have considered federal law when reviewing discrimination claims based on state law. *Featherly, supra,* 194 Mich.App 358-359. When proving a prima facie case of discrimination in a workforce-reduction case, the plaintiff must offer "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Barnes v. GenCorp, Inc,* 896 F.2d 1457, 1465 (CA 6, 1990). Although plaintiff has presented a chart that lists all of the OB-GYN physicians employed by defendant during the preceding three years, this Court has stated that statistical evidence provided only weak circumstantial evidence of discrimination when the population was 250 people, which is substantially greater than the population of plaintiff's chart. *Featherly, supra,* 194 Mich.App 354, 360-361. Because plaintiff has not presented any direct, circumstantial, or statistical evidence that tends to indicate that plaintiff was discharged due to his age or national origin, we conclude plaintiff was not singled out during the workforce reduction.

Plaintiff also argues that defendant had a history of showing favoritism toward Drenchko, evidencing discriminatory intent under *Featherly, supra,* 194 Mich.App 360. However, there is no evidence that anyone made discriminatory remarks about plaintiff or that plaintiff had superior qualifications to Drenchko. Additionally, although plaintiff argues he was a better candidate than Drenchko, we will not question the soundness of defendant's selection in a workforce-reduction case. *Town, supra,* 455 Mich. 704. As our Supreme Court stated in *Town, supra,* the "plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus

motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* Therefore, whether plaintiff was more qualified than Drenchko is immaterial.

Plaintiff failed to offer direct, circumstantial, or statistical evidence that defendant had a discriminatory animus or singled plaintiff out for termination based on impermissible reasons. Because plaintiff failed to present a prima facie case of either age or national origin discrimination, the trial court did not err in granting defendant's motion for summary disposition. As such, since remand is unnecessary, plaintiff's request to disqualify the trial judge on remand is moot.

Affirmed.

Not Reported in N.W.2d, 2004 WL 790423 (Mich.App.)

END OF DOCUMENT


Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Appeals of Michigan.
Nancy PENZATO, Plaintiff-Appellant,
v.
CONTINENTAL CABLEVISION OF MICHIGAN,
INC., Defendant-Appellee.
No. 175748.

July 5, 1996.

Before: FITZGERALD, P.J., and CORRIGAN and
C.C. SCHMUCKER, [FN*] JJ.

FN* Circuit judge, sitting on the Court of
Appeals by assignment.

PER CURIAM.

*1 Plaintiff appeals as of right from the order
granting summary disposition in favor of defendant
in this weight discrimination case. We affirm.

Plaintiff began employment with defendant on
February 2, 1987. At that time, plaintiff was five feet
tall and weighed approximately 170 pounds. By
1989, plaintiff had lost some weight. [FN1] In her
complaint, plaintiff alleged that her supervisor, Carol
Bouchard, discriminated against her because she was
of average weight. Bouchard allegedly was "greatly
overweight." According to plaintiff, Bouchard made
harassing comments to her about the weight loss, and
told plaintiff that she could not wear certain attire
because it appeared "unprofessional."

FN1. The parties dispute the exact amount
of the weight loss. Plaintiff claims that she
lost over fifty pounds. Relying on plaintiff's
medical records, defendant claims that
plaintiff lost fewer than twenty pounds.

Plaintiff also alleged that during the summer of 1989
Bouchard referred to employees of average weight,
including plaintiff, as "sexy bitches." Bouchard stated
that the employees wore "hooker clothes" and
"hooker heels." Plaintiff also alleged that Bouchard
told her that she could not take her breaks with her

coworkers, and that she could not associate with
former employees or her next evaluation would "not
be good."

According to plaintiff, Bouchard did not speak to her
except to give orders. Bouchard allegedly placed
notes in plaintiff's personnel file without informing
plaintiff of the notes. Plaintiff claimed that she was
ordered to return to work during her scheduled
breaks, and was disciplined for having a "bad
attitude" and for her job performance. On May 18,
1990, Bouchard suspended plaintiff for one day
because she spoke inappropriately to a coworker.
Plaintiff alleged that Bouchard did not act similarly
toward the other workers who were overweight.

On May 21, 1990, plaintiff resigned her employment
with defendant as a "necessary result of the
harassment and unfair discipline." Plaintiff alleged
that her resignation acted as a constructive discharge.

Plaintiff filed a complaint in December 1992
alleging height and weight discrimination, as well as
sex discrimination and unlawful retaliation. Plaintiff
subsequently stipulated to the dismissal of her sex
discrimination and retaliation claims.

At the hearing on defendant's motion for summary
disposition, the trial court concluded that plaintiff,
who was of normal, average weight, had no basis on
which to bring suit under the Elliott-Larsen Civil
Rights Act, M.C.L. § 37.2101 et seq.; MSA
3.548(101) et seq., because the act applies only to
those individuals who are extremely overweight or
underweight. The trial court also noted that plaintiff
voluntarily left her employment. On April 27, 1994,
the trial court granted defendant's motion for
summary disposition.

The Elliott-Larsen Civil Rights Act prohibits an
employer from discriminating against an individual
on the basis of, inter alia, weight. MCL
37.2202(1)(a); MSA 3.548(202)(10(a). The plaintiff
in a case alleging unlawful discrimination initially
has the burden of proving a prima facie case of
discrimination by a preponderance of the evidence.
Dubrey v. Stroh Brewery Co 185 Mich.App 561, 563;
462 NW2d 758 (1990). The issue of what a plaintiff
must prove to establish discrimination based on
weight has not yet been decided in Michigan and is
not addressed in any Michigan statute. However, we

find application of the elements of a prima facie case of age discrimination equally applicable in a weight discrimination case. Therefore, a prima facie case of weight discrimination can be made by proving either intentional discrimination or disparate treatment. *Wolff v Automobile Club of Michigan,* 194 Mich.App 6, 11; 486 NW2d 75 (1992). To establish a prima facie case of weight discrimination under the intentional discrimination theory, plaintiff must show that (1) she is a member of a statutorily protected class; (2) that she was qualified for the job; (3) that she was discharged from the job; and (4) that she was replaced by someone outside the protected group. *Featherly v. Teledyne Industries, Inc,* 194 Mich.App 352, 358; 486 NW2d 361 (1992). In proving disparate treatment, plaintiff must show that she was a member of a protected class and that she was treated differently than persons of a different class for the same or similar conduct. *Barnell v. Taubman Co, Inc,* 203 Mich.App 110, 120; 512 NW2d 13 (1993). Weight need not be the only reason or main reason for discharge, but must be one of the reasons that made a difference in determining whether to discharge a person. *Id. at 121.*

**\*2** Plaintiff first argues that the trial court erred in determining that, as an individual of average weight, she is not a member of a statutorily protected class. We review de novo such questions of law. *Labor Council, Michigan Fraternal Order of Police v City of Detroit,* 207 Mich.App 606, 607; 525 NW2d 509 (1994).

The primary goal of judicial interpretation of statutes is to give effect to the intent of the Legislature. *People v. Stanaway,* 446 Mich. 643, 658; 521 NW2d 557 (1995), cert pending. The first criterion in determining intent is the specific language of the statute. *House Speaker v. State Administrative Bd,* 441 Mich. 547, 567; 495 NW2d 539 (1993). If the plain meaning of the statute is clear, judicial construction is normally neither permitted nor necessary. *Lorencz v. Ford Motor Co,* 439 Mich. 370, 376; 483 NW2d 844 (1992).

The term "weight" is not statutorily defined. However, given the act's designated purpose of eliminating the effects of offensive or demeaning stereotypes, prejudices, and biases, see *Malan v Gen'l Dynamics Land Systems, Inc,* 212 Mich.App 585, 587; 538 NW2d 76 (1995), it appears that the Legislature was concerned that overweight people would be cast aside on the basis of inaccurate stereotypes about their abilities. Plaintiff cannot argue that she is similarly victimized. [FN2] An

absurd result would occur if this Court were to interpret the statute to afford protection to persons who are "average" and are not subject to "offensive or demeaning stereotypes, prejudices, or biases." Accordingly, under the facts of this case, we hold that plaintiff has not established that she is a member of a statutorily protected class. [FN3] Plaintiff has failed to make out a prima facie case of discrimination based on weight.

> FN2. This is particularly true in a case such as this, where no evidence was presented that plaintiff was replaced by a worker outside the "protected group." To hold otherwise would open the floodgates for nonmeritorious suits.

> FN3. Our holding is limited to the facts of this case.

Assuming arguendo that plaintiff could establish that she is a member of a protected class, we also find that plaintiff was not constructively discharged from her employment. Constructive discharge has been found where:

[A]n employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, or stated differently, when working conditions become so difficult or unpleasant that a reasonable person in the employee's shoes would feel compelled to resign. [*Vagt's v. Perry Drug Stores, Inc,* 204 Mich.App 481, 487; 516 NW2d 102 (1994) (citation omitted).]

Here, plaintiff has not presented sufficient facts to support her allegation that her working conditions were so difficult, intolerable, or unpleasant that she was constructively discharged. Cf. *Manning v. City of Hazel Park,* 202 Mich.App 685; 509 NW2d 874 (1993), and *Hammond v. United of Oakland, Inc,* 193 Mich.App 146; 483 NW2d 652 (1992). A reasonable juror could not conclude that plaintiff's working conditions were so intolerable that a reasonable person would have felt compelled to resign.

Affirmed.

Not Reported in N.W.2d, 1996 WL 33324109 (Mich.App.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.


**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,W.D. Michigan,
Southern Division.
Shelly L. CHRISMAN, Plaintiff,
v.
RAPID-LINE, INC. Defendant.
**No. 1:04-CV-509.**

June 21, 2005.

*OPINION*

QUIST, J.

*1 Plaintiff, Shelly L. Chrisman ("Chrisman"), has sued Defendant, Rapid-Line, Inc. ("Rapid-Line"), alleging that Rapid-Line violated the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § § 2601 to 2654, by failing to reinstate her to her previous position or to an equivalent position in February 2004, following an extended medical leave for depression. Now before the Court is Rapid-Line's motion for summary judgment, in which Rapid-Line contends that it is entitled to judgment as a matter of law because Chrisman was unable to return to work after she had exhausted her twelve weeks of FMLA leave and, pursuant to *Cehrs v. Northeast Ohio Alzheimer's Research Center,* 155 F.3d 775 (6th Cir.1998), it had no obligation to reinstate Chrisman. For the reasons set forth below, the Court agrees and will grant Rapid-Line's motion for summary judgment.

I. *Facts*

Rapid-Line is a sheet metal fabrication job shop. Chrisman was employed by Rapid-Line for approximately 18 years, beginning in 1985. At the time of the incidents relevant to this case, Chrisman was employed as a press operator on the second shift. On or about November 19, 1999, Chrisman received a copy of Rapid-Line's employee handbook. (Chrisman Dep. at 23; Acknowledgment of Receipt, Chrisman Dep. Ex. 2.) The employee handbook sets forth Rapid-Line's FMLA policy, including rules for coordination of FMLA leave with other types of leave or time off and a definition of the eligibility year. For purposes of calculating FMLA leave,

Rapid-Line has adopted a "rolling" year, which measures the 12-month FMLA period backward from the date the employee uses FMLA leave. (Employee Handbook at 24 ("The amount of FMLA leave available to an employee will be based on the 12-month period immediately preceding the date the employee uses any FMLA leave.")) *See* 29 C.F.R. § 825.200(b)(4) (describing a "rolling" year as an option that an employer may choose for calculating FMLA leave). When FMLA leave is used for a serious medical condition of the employee, sick pay, vacation pay, and personal day pay (in that order) is applied toward the exhaustion of the employee's FMLA Leave. (Employee Handbook at 23.) Thus, "[a]ll time off work which meets the definitions under FMLA [is] charged against the yearly FMLA allowance." (*Id.*)

During 2003, Chrisman was absent from work on a significant number of days for various medical reasons. The evidence in the record shows that Chrisman missed approximately 100 full and partial days of work. (Chrisman Vacation & Personal Hours Report ("Vacation Report"), Lindquist Dep. Ex. 3; Chrisman Absenteeism Report ("Absenteeism Report"), Lindquist Dep. Ex. 4.) Most, if not all, of Chrisman's unpaid time off was for sick time excused by a doctor. (Chrisman Dep. at 41.)

Chrisman missed work during the week of February 10, 2003, through February 14, 2003. (Vacation Report; Absenteeism Report.) This absence was due to Chrisman's endometriosis, which causes her to suffer cramps and "get real sick." (Chrisman Dep. at 35-36;.) Chrisman saw her doctor for this condition on February 12, 2003. (2/2/03 Examination Notes, attached to Bernard Aff.) Chrisman testified that the cramping interfered with her work because she had to stand most of the time to perform her job. (Chrisman Dep. at 36.)

*2 Chrisman also missed most of the work days from April 7, 2003, to April 25, 2003, due to a serious bladder and kidney infection. (*Id.* at 36-37; Absenteeism Report) Chrisman's doctor excused her from work during that time. (Chrisman Dep. at 37.) Chrisman provided Rapid-Line a Disability Certificate signed by her doctor, which indicated that Chrisman was totally incapacitated during part of this time (from April 9, 2003, to April 14, 2003). (*Id.*; Disability Certificate, Chrisman Dep. Ex. 4.) In

addition, Chrisman filed a claim for short term disability benefits. The application, signed by both Chrisman and her doctor, stated that Chrisman was disabled from April 7, 2003, through April 28, 2003. (Chrisman Dep. at 37-38; Disability Claim Form, Chrisman Dep. Ex. 5.)

> FN1. Chrisman missed full days on April 7 and 8 and from April 15 to April 25. Chrisman worked 1.6 hours, 1.3 hours, 4 hours, and 4.75 hours on April 9-11 and 14, respectively. (Absenteeism Report.)

In September 2003, Chrisman was off work for approximately three days for cardiac testing and treatment for heart palpitations. (Absenteeism Report; 9/9/03, 9/16/03, 9/22/03, and 9/23/03, Examination Notes.)

On October 9, 2003, Chrisman's brother, Michael Chrisman, who was also a Rapid-Line employee, suffered a stroke. He died two days later. As a result of Michael's death, Chrisman became clinically depressed. Initially, Chrisman's doctor certified that Chrisman was unable to work from October 10, 2003, to November 10, 2003, due to "acute depressive episode." (Chrisman Dep. at 81; FMLA Certification, Chrisman Dep. Ex. 16.) Subsequently, Chrisman's doctor extended Chrisman's return-to-work date four times, the last date being January 2, 2004. (Chrisman Dep. at 80-82; 11/6/03, 11/13/03, 11/21/03, and 12/2/03, Excuse Slips, Chrisman Dep. Exs. 13-17.) However, Chrisman testified that February 9, 2004, was the first day that she was medically released to return to work. (Chrisman Dep. at 88-89.) On December 15, 2003, Rapid-Line terminated Chrisman's employment for excessive absences from work.

## II. *Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant

summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986)).

## III. *Discussion*

The FMLA provides eligible employees with a maximum of twelve weeks of unpaid leave in a given twelve month period to attend to certain family and medical matters. 29 U.S.C. § 2612(a). Leave may be taken for specified reasons, including medical reasons, childbirth or adoption, or for the care of a spouse, parent, or child who suffers from a serious health condition. *Id.* Upon return from FMLA leave, an employer must restore an employee to his or her former job or another position with equivalent pay, benefits, and conditions of employment. 29 U.S.C. § 2614(a)(1). In *Cehrs v. Northeast Ohio Alzheimer's Research Center,* 155 F.3d 775 (6th Cir.1998), the Sixth Circuit held that an employer does not violate the FMLA by terminating an employee, even prior to the end of the statutory twelve-week leave period, if the employee "was clearly unable to return to work within the period provided by the FMLA." *Id.* at 785. The employee in *Cehrs* initially gave her employer a medical leave of absence form indicating that the employee was unable to work commencing on November 22, 1993. The form did not include an anticipated return date. Subsequently, the employee's doctor advised the employer of a tentative return to work date of January 20, 1994. Ultimately, the employee's doctor extended the leave to March 1, 1994, when the employee could begin working on a part-time basis. The employer eventually terminated the employee. Even though the employee claimed that the termination occurred prior to the end of the twelve-month period, the Sixth Circuit agreed with the district court that the employer was entitled to summary judgment because there was no dispute that as of February 12, 1994-the date the employee's FMLA leave would have ended-the employee was still unable to return to work. *Id.* at 784-85.

**\*3** Rapid-Line argues that it is entitled to summary judgment because as of December 15, 2003, when it terminated Chrisman, Chrisman had used up all twelve weeks of her FMLA leave and she was unable to return to work. Rapid-Line further argues that, as in *Cehrs,* it is entitled to summary judgment even if Chrisman had not exhausted her twelve weeks of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1460291 (W.D.Mich.)
(Cite as: Slip Copy)

Page 3

FMLA leave as of December 15, 2003, because Chrisman admits that she was not released to return to work until February 9, 2004-well beyond the end of Chrisman's FMLA leave. Chrisman argues that Rapid-Line's motion must be denied because Rapid Line's own records show that as of December 15, 2003, when Chrisman was discharged, Chrisman had exhausted only ten weeks of unpaid leave. Chrisman asserts that *Cehrs* has no application in this case because the plaintiff in *Cehrs* was terminated following the end of the FMLA period. In addition, Chrisman argues that Rapid-Line was aware that Chrisman was released to return to work on January 2, 2004, which would have been within the period of Chrisman's FMLA leave.

Rapid-Line is entitled to summary judgment because it has properly shown that as of December 15, 2003, Chrisman had exhausted her twelve weeks of FMLA leave and was unable to return to work. The twelve weeks includes, at a minimum: (1) one week in February 2003 relating to Chrisman's endometriosis; (2) two weeks, three days, 4.35 hours in April 2003; (3) two days, 6.65 hours in September; and (4) eight weeks between October 20, 2003, and December 12, 2003. Chrisman does not argue or attempt to show that this time off was not FMLA-qualifying leave because it was not for a "serious health condition." *See* 29 U.S.C. § 2611(11). Instead, Chrisman argues that Rapid-Line's own documents show that as of September 25, 2003, Chrisman had used only eight days of medical leave, and, thus, she could not have used twelve weeks of FMLA leave by December 15. This argument fails because it relies solely upon Rapid-Line's internal accounting "codes" that are used solely for payroll purposes and do not necessarily relate to whether a particular absence was FMLA-qualifying leave. (Lindquist Dep. at 29-32.) As Kathy Lindquist explained, the particular codes are "for payroll and points" and are "not concerned about FMLA." (*Id.* at 32.) Moreover, Chrisman's argument ignores Rapid Line's evidence showing that Chrisman had more than eight hours of FMLA leave prior to September 25, 2003.

> FN2. The eight weeks does not count the three bereavement days on October 15, 16, and 17.

Chrisman also argues that paid vacation days, sick leave, and personal days (days on which she was excused) cannot be considered in determining how much FMLA leave time Chrisman used. This argument is contrary to both fact and law. Pursuant to

Section 102(d)(2)(B), 29 U.S.C. § 2612(d)(2)(B), "an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or medical or sick leave of the employee for leave" for a serious health condition. As noted above, pursuant to Rapid-Line's FMLA policy, when an employee uses FMLA leave for a serious health condition of the employee, Rapid-Line requires the employee to use paid leave (sick pay, vacation pay, and personal day pay) as FMLA leave. (Employee Handbook at 23.) Thus, Chrisman's argument that she never agreed to consider excused absence days or vacation days taken during the year as FMLA leave must be rejected, and Rapid-Line may properly count Chrisman's paid days as FMLA leave. Citing Section 102(b)(1), 29 U.S.C. 2612(b)(1), Chrisman also argues that Rapid-Line may not count every day of intermittent leave in calculating the twelve week period. This argument is based upon a misreading of Section 102(b)(1), which states that for leave taken for a serious health condition of the employee (Section 102(a)(1)(D)), "leave ... may be taken intermittently or on a reduced leave schedule when medically necessary." 29 U.S.C. § 2612(b)(1). The preceding sentence of Section 102(b)(1), which requires the agreement of the employee and the employer, applies to leave taken under Section 102(a)(1)(A) and (B) for the birth of a child of the employee or the adoption of a child by the employee, but not to leave taken for a serious health condition of the employee.

> FN3. Chrisman does not argue, as she could have, that paid leave should not be counted as FMLA leave because Rapid-Line failed to notify her, as required by 29 C.F.R. § 825.208, that the paid leave would be considered FMLA leave. *See* *Plant v. Morton Int'l, Inc .,* 212 F.3d 929, 935-36 (6th Cir.2000). Following the Supreme Court's decision in *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 122 S.Ct. 1155 (2002), the validity of such an argument is highly questionable. Indeed, several district courts within the Sixth Circuit have questioned whether the Sixth Circuit's decision in *Plant* remains good law in light of the Supreme Court's holding in *Ragsdale* that 29 C.F.R. § 825.700(a) is invalid and have imposed a requirement that a plaintiff show some prejudice as a result of the employer's failure to designate leave as FMLA leave. *See* *Donahoo v. Master Data Ctr.,* 282 F.Supp.2d 540, 554-55

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1460291 (W.D.Mich.)
(Cite as: Slip Copy)

Page 4

(E.D.Mich.2003); *Thompson v. Diocese of Saginaw*, No. 02-10267-BC, 2004 WL 45519, at *6-7 (E.D.Mich. Jan. 6, 2004); *Summers v. Middleton & Reutlinger, P.S.C.*, 214 F.Supp.2d 751, 757 (W.D.Ky.2002); *Roberson v. Cendant Travel Servs., Inc.*, 252 F.Supp.2d 573, 577 (M.D.Tenn.2002).

FN4. Chrisman incorrectly cites Section 102(a)(1)(b), which does not exist. Section 102(a)(1)(B), which does exist, permits leave for "the placement of a son or daughter with the employee for adoption or foster care." 29 U.S.C. § 2612(a)(1)(B).

*4 Even if Chrisman had not used her twelve weeks of FMLA leave as of December 15, 2003, Rapid-Line would still be entitled to summary judgment because Chrisman could not have returned to work after twelve weeks of FMLA leave. Chrisman alleged in her complaint and testified under oath in her deposition that February 9, 2004, was the first day that she was medically released to return to work. (Compl. ¶ 22; Chrisman Dep. at 89.) According to Chrisman's own allegations and testimony, she could not have returned to work until after she had used her twelve weeks of FMLA leave. Therefore, pursuant to *Cehrs*, Rapid-Line is also entitled to summary judgment on the basis that Chrisman could not return to work at the conclusion of twelve weeks of FMLA leave.

In spite of her prior admissions, Chrisman attempts to avoid *Cehrs* by arguing that she could have returned to work by January 2, 2004, which, Chrisman argues, was within the FMLA twelve week period. Although there are several grounds to reject this argument, two will suffice. First, it is well established in the Sixth Circuit that a party may not create a genuine issue of material fact by filing an affidavit that contradicts her prior deposition testimony. *See Reid v. Sears, Roebuck & Co.*, 790 F.2d 453 (6th Cir.1986). Here, Chrisman has not even attempted to contradict her own prior testimony by affidavit, but instead relies upon unsupported factual assertions in her brief. Second, Chrisman's argument does not aid her cause because, based upon her own admission in her brief, the purported January 2, 2004, return date would still have been after Chrisman had exhausted her twelve weeks of FMLA leave. Chrisman concedes that as of December 15, 2003, she had exhausted ten weeks of unpaid leave. (Pl.'s Resp. Br. at 7.) Because January 2, 2004, was at the end of the third workweek following December 15, 2003, Chrisman would not have returned to work before the end of the twelve

week period.

Finally, the Court notes that Chrisman's new theory is essentially that she was cleared to return to work on January 2, 2004, but that Rapid-Line's December 15, 2003, termination and ancillary termination of health insurance exacerbated her condition, thus leading to a later return date of February 9, 2004. The court in *Roberson v. Cendant Travel Services, Inc.*, 252 F.Supp.2d 573 (M.D.Tenn.2002), rejected a similar argument on the ground that the FMLA merely permits an employee to take medical leave and does not make an employer liable for causing or contributing to an employee's serious health condition. *Id.* at 581. This Court agrees with that assessment. Therefore, Chrisman's argument that Rapid-Line somehow exacerbated her health problems does not further her FMLA claim.

FN5. Rapid-Line has shown that Chrisman did not actually learn of the termination of her insurance coverage until January 2004.

IV. *Conclusion*

For the foregoing reasons, the Court will grant Rapid-Line's motion for summary judgment.

An Order consistent with this Opinion will be entered.

W.D.Mich.,2005.
Chrisman v. Rapid-Line, Inc.
Slip Copy, 2005 WL 1460291 (W.D.Mich.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 2234900 (Trial Pleading) Answer and Affirmative Defenses (Sep. 03, 2004)
• 1:04cv00509 (Docket) (Aug. 04, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

356 F.Supp.2d 1306
356 F.Supp.2d 1306, 18 Fla. L. Weekly Fed. D 301, 10 Wage & Hour Cas.2d (BNA) 580
**(Cite as: 356 F.Supp.2d 1306)**

Page 1

**H**
Briefs and Other Related Documents

United States District Court,S.D. Florida.
Tracy M. BARNES, Plaintiff,
v.
ETHAN ALLEN, INC., Defendant.
**No. 04-61083CIV.**

Feb. 15, 2005.

**Background:** Former employee sued former employer for alleged violation of Family and Medical Leave Act (FMLA). Former employer moved for summary judgment and for imposition of sanctions.

**Holdings:** The District Court, Cohn, J., held that:

2(1) former employer did not interfere with former employee's rights under FMLA;

3(2) former employer's reason for termination was not pretext for retaliation for former employee's use of FMLA leave;

5(3) six-week-old note in which former employee's doctor had stated prospectively that former employee could return to work in four to six weeks did not qualify as fitness-for-duty certification; and

7(4) medical certification submitted four weeks after former employee's FMLA leave expired did not qualify as fitness-for-duty certification.

Summary judgment motion granted; motion for sanctions denied.

West Headnotes

**[1] Labor and Employment 231H ☜363**

231H Labor and Employment
   231HVI Time Off; Leave
      231Hk361 Rights of Employee; Violations
         231Hk363 k. Denial of or Interference with Rights in General. Most Cited Cases

**Labor and Employment 231H ☜365**

231H Labor and Employment
   231HVI Time Off; Leave
      231Hk361 Rights of Employee; Violations
         231Hk365 k. Retaliation in General. Most Cited Cases
Family and Medical Leave Act (FMLA) creates two types of claims: interference claims, in which employee asserts that employer denied or otherwise interfered with his substantive rights under FMLA, and retaliation claims, in which employee asserts that employer discriminated against him because he engaged in activity protected by FMLA. Family and Medical Leave Act of 1993, § 105(a)(1, 2), 29 U.S.C.A. § 2615(a)(1, 2); 29 C.F.R. § 825.220(c).

**[2] Labor and Employment 231H ☜356**

231H Labor and Employment
   231HVI Time Off; Leave
      231Hk353 Terms and Conditions of Leave
         231Hk356 k. Commencement, Duration, and Termination of Leave. Most Cited Cases

**Labor and Employment 231H ☜368**

231H Labor and Employment
   231HVI Time Off; Leave
      231Hk361 Rights of Employee; Violations
         231Hk368 k. Discharge or Layoff. Most Cited Cases
Former employer did not interfere with former employee's rights under Family and Medical Leave Act (FMLA) when former employee received more than 12 weeks of leave due to her medical condition; although, ultimately, former employee's termination from former employer's payroll was effective several months earlier than time at which termination formally occurred, such later action did not deny or prevent former employee from taking FMLA leave. Family and Medical Leave Act of 1993, § 105(a)(1), 29 U.S.C.A. § 2615(a)(1).

**[3] Labor and Employment 231H ☜368**

231H Labor and Employment
   231HVI Time Off; Leave
      231Hk361 Rights of Employee; Violations
         231Hk368 k. Discharge or Layoff. Most Cited Cases
Former employer's reason for terminating former

356 F.Supp.2d 1306
356 F.Supp.2d 1306, 18 Fla. L. Weekly Fed. D 301, 10 Wage & Hour Cas.2d (BNA) 580
**(Cite as: 356 F.Supp.2d 1306)**

Page 2

employee, her absence from work resulting from failure to submit required fitness-for-duty certification upon conclusion of her leave under Family and Medical Leave Act (FMLA), was not pretext for retaliation for former employee's use of FMLA leave, precluding former employer's liability for alleged violation arising from termination. Family and Medical Leave Act of 1993, § 105(a)(1, 2), 29 U.S.C.A. § 2615(a)(1, 2); 29 C.F.R. § § 825.220(c), 825.310(a, c), 825.311(c).

**[4] Labor and Employment 231H ☜⟶365**

231H Labor and Employment
    231HVI Time Off; Leave
        231Hk361 Rights of Employee; Violations
            231Hk365 k. Retaliation in General. Most Cited Cases
To state a claim of retaliation under Family and Medical Leave Act (FMLA) based on indirect or circumstantial evidence, an employee must allege that (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment decision, and (3) the decision was causally related to the protected activity. Family and Medical Leave Act of 1993, § 105(a)(1, 2), 29 U.S.C.A. § 2615(a)(1, 2); 29 C.F.R. § 825.220(c).

**[5] Labor and Employment 231H ☜⟶367(5)**

231H Labor and Employment
    231HVI Time Off; Leave
        231Hk361 Rights of Employee; Violations
            231Hk367 Reinstatement; Restoration
                231Hk367(5) k. Ability to Perform. Most Cited Cases
Six-week-old note in which employee's doctor had stated prospectively that employee could return to work in four to six weeks did not qualify as fitness-for-duty certification under regulation allowing employers to require employees to provide such certification upon conclusion of leave under Family and Medical Leave Act (FMLA), inasmuch as certification had to be relevant to employee's condition at the time leave was concluded. 29 C.F.R. § 825.310(c).

**[6] Labor and Employment 231H ☜⟶360**

231H Labor and Employment
    231HVI Time Off; Leave
        231Hk353 Terms and Conditions of Leave
            231Hk360 k. Other Particular Terms and Conditions. Most Cited Cases

**Labor and Employment 231H ☜⟶374**

231H Labor and Employment
    231HVI Time Off; Leave
        231Hk373 Non-Statutory Rights; Relationship to Statutory Rights
            231Hk374 k. In General. Most Cited Cases
Leave under Family and Medical Leave Act (FMLA) need not be paid leave. Family and Medical Leave Act of 1993, § 2 et seq., 29 U.S.C.A. § 2601 et seq.

**[7] Labor and Employment 231H ☜⟶367(5)**

231H Labor and Employment
    231HVI Time Off; Leave
        231Hk361 Rights of Employee; Violations
            231Hk367 Reinstatement; Restoration
                231Hk367(5) k. Ability to Perform. Most Cited Cases
Medical certification submitted four weeks after employee's leave under Family and Medical Leave Act (FMLA) expired did not qualify as fitness-for-duty certification under FMLA regulations. 29 C.F.R. § 825.310(c).

**\*1308** Donald Appignani, Esquire, Joel E. Greenberg, P.A., Lauderhill, Counsel for Plaintiff. Richard D. Tuschman, Esquire, Epstein, Becker & Green, P.C., Miami, Counsel for Defendant.

***ORDER GRANTING MOTION FOR SUMMARY JUDGMENT***
COHN, District Judge.
THIS CAUSE is before the Court upon the Defendant's Motion for Summary Judgment [DE 14]. The Court has carefully considered the motion, response and reply thereto, and is otherwise fully advised in the premises.

### I. BACKGROUND

Plaintiff Tracy M. Barnes ("Plaintiff"), filed this action against Defendant Ethan Allen, Inc., her former employer ("Defendant"), for alleged violation of the Family and Medical Leave Act ("FMLA"). Plaintiff worked for Defendant from October 28, 2002 through some time in early 2004 at a retail store located in Pembroke Pines, Florida. Plaintiff's employment record with Defendant included recognition as one of Defendant's "top ten design consultants in the Southeast region."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

356 F.Supp.2d 1306
356 F.Supp.2d 1306, 18 Fla. L. Weekly Fed. D 301, 10 Wage & Hour Cas.2d (BNA) 580
(Cite as: 356 F.Supp.2d 1306)

Page 3

On December 3, 2003, Plaintiff became ill with severe pains in her lower abdomen. After being diagnosed with kidney stones, Plaintiff notified Defendant of her condition on December 5, 2003. On December 24, 2003, Regina Leuci of Defendant's corporate office sent Plaintiff the FMLA forms and health care provider certification that Plaintiff was required to return. Exhibit 5 to Deposition of Tracy Barnes [DE 33]. The pages of these forms that the Defendant filled out stated, among other things, that the FMLA leave would continue until January 26, 2004, and that Plaintiff "will ... be required to present a fitness-for-duty certificate prior to being restored to employment. If such certification is required but not received, you may be terminated." Page A1 of Exhibit 5 to Barnes Deposition. On January 7, 2004, Plaintiff submitted the forms and was also approved for Short Term Disability ("STD") benefits. See Exhibits 6 and 7 to Barnes Deposition.

> FN1. The deposition of Tracy Barnes was also filed by Defendant [DE 18].

On January 14, 2004, after having another round of kidney stones diagnosed at a hospital on January 6, 2004, Plaintiff's treating physician, Dr. William DeMarchi saw Plaintiff. On this date he provided Plaintiff with a "Return to Work/School" note stating that she has been under his care from December 4, 2003 through "4-6 weeks from today 01/14/04." Exhibit 10 to Barnes Deposition. Plaintiff testified that she sent this note to Lisa Greenberg and Kathy Linkletter, who were her supervisors at the retail store where Plaintiff worked. On January 16, 2004, Plaintiff telephoned Regina Leuci at the corporate office to inform her that she would be out of work for another 4-6 weeks.

> FN2. There appears to be a factual dispute regarding Plaintiff's submission of the January 14, 2004 note to Defendant. For purposes of summary Judgment, the Court looks at the facts in the light most favorable to Plaintiff.

During February, according to Plaintiff, she began feeling better. She attempted to contact both her supervisors at the store and Ms. Leuci at the corporate office. Plaintiff testified that her supervisors told her that she still had the job. Plaintiff *1309 also testified that when she asked Kathy Linkletter to return to work, she was referred

to the corporate office. When Plaintiff contacted the corporate office, she was referred to the store. Barnes Deposition at 63. Meanwhile, on February 4, 2004, Prudential Insurance, the administrator of the STD benefits wrote to Plaintiff to inform her that her benefits were approved through January 4, 2004. Exhibit 6 to Barnes deposition. Plaintiff must have submitted further documentation, because on February 26, 2004, Prudential again wrote to Plaintiff to inform her that her STD benefits expired on January 18, 2004. Exhibit 7 to Barnes deposition. Finally, on March 4, 2004, Prudential wrote to Ethan Allen's corporate office that Plaintiff's STD benefits were terminated effective January 26, 2004. Exhibit 8 to Barnes deposition.

On March 16, 2004, Ethan Allen's corporate office wrote to Plaintiff to inform her that her paid medical leave ended on January 26, 2004. Exhibit 9 to Barnes Deposition. On March 18, 2004, new store manager Brenda Morton sent a certified letter to Plaintiff stating that Prudential has informed Ethan Allen that Plaintiff's disability leave ended on January 26, 2004, but that Plaintiff had not returned to work. Exhibit 13. This letter further informed Plaintiff to send any medical documentation explaining her absence to Regina Leuci at the corporate office. Id. In response to this letter, Plaintiff faxed a March 23, 2004 doctor's note to the store, not to the corporate office. Exhibit 14; Barnes Deposition at 71-72. Though she did not remember how she sent the doctor's note to Regina Leuci, Plaintiff believes that she did. Id. at 72. In her deposition, Plaintiff conceded that she did not present a fitness-for-duty certification prior to March 23, 2004, though her position is that she was never informed of this requirement when she spoke with her supervisors in February, 2004. Barnes Deposition at 54, 58-59, 62, 64, 70, 73. Plaintiff did concede earlier in her deposition that she was aware that the form she received from Defendant and signed on January 7, 2004 stated the requirement of submission of a fitness-for-duty certification. Barnes deposition*1310 at 46-47. Plaintiff never did return to work, and was terminated on July 27, 2004 for having an unexplained absence for six months. This lawsuit was filed on August 17, 2004.

> FN3. The March 23, 2004 note states that Plaintiff was incapacitated from December 4, 2003 to the present, and could return to work "part time for 10 days. Pt has follow up on March 29." Exhibit 14 to Barnes Deposition. The note was actually signed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

356 F.Supp.2d 1306
356 F.Supp.2d 1306, 18 Fla. L. Weekly Fed. D 301, 10 Wage & Hour Cas.2d (BNA) 580
**(Cite as: 356 F.Supp.2d 1306)**

Page 4

by Dr. DeMarchi's partner, Dr. Barbarite. Deposition of William DeMarchi at 29. Dr. DeMarchi's testified that while his office did not provide any documentation to Plaintiff specifically authorizing a "return to work," in reviewing her file, the earliest date that she was able to return to work would be four to six weeks from January 14, 2004, based upon the note from that date. DeMarchi deposition at 32-33. For reasons explained in the next section, this factual dispute regarding the date Plaintiff was actually fit to return to work is not material to resolution of the Defendant's motion.

FN4. In her declaration submitted with her opposition to Defendant's motion, Plaintiff states that she called Regina Leuci on Monday, March 22, 2004 in response to the March 16 and March 18, 2004 letters from Regina Leuci and Brenda Morton, Declaration of Tracy Barnes [DE 31]. Plaintiff then states that Ms. Leuci told her to obtain a doctor's note and bring it to the store. Plaintiff's declaration then states that she brought the note to the store, but Brenda Morton "was too busy to deal with me." Plaintiff states that she received no further information from Ethan Allen until her July, 2004 termination letter.

FN5. Plaintiff did testify that her gynecologist had authorized her return to work, but this doctor was not treating Plaintiff for the kidney stones, but rather a hormonal problem. Barnes Deposition at 62.

FN6. Barnes at one point testified that "I was told I needed a doctor's note in order to return to work, and I got a doctor's note to return to work [referring to the March 23, 2004 note]." Barnes Deposition at 64.

Following a period of discovery, Defendant moved for summary judgment on Plaintiff's FMLA claim. After Defendant filed its reply on January 27, 2005, Plaintiff moved to strike the supplemental declaration of Regina Leuci. Defendant filed an opposition to this motion and a request for sanctions against Plaintiff for filing the motion to strike [DE 36]. Plaintiff withdrew the motion to strike on January 31, 2005 [DE 37]. The motion for summary judgment is therefore ripe for review.

## II. DISCUSSION

### A. Summary Judgment Standard

The Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265(1986). The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and any doubts in this regard should be resolved against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323, 106 S.Ct. 2548. To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case. Id. at 325, 106 S.Ct. 2548.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). According to the plain language of Fed.R.Civ.P. 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but instead must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); Matsushita, 475 U.S. at 587, 106 S.Ct. 1348.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. Anderson, 477 U.S. at 257, 106 S.Ct. 2505. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

356 F.Supp.2d 1306
356 F.Supp.2d 1306, 18 Fla. L. Weekly Fed. D 301, 10 Wage & Hour Cas.2d (BNA) 580
(Cite as: 356 F.Supp.2d 1306)

Page 5

find for that party." *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson,* 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202.

### B. Family and Medical Leave Act

[1] To preserve the availability of the rights granted by the FMLA, and to enforce them, "the FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, *see* 29 U.S.C. § 2615(a)(1), and retaliation claims, in *1311 which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act, *see* 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220(c)." *Strickland v. Water Works and Sewer Bd. of the City of Birmingham,* 239 F.3d 1199, 1206 (11th Cir.2001).

> FN7. While the FMLA does not clearly delineate these two claims, "interference" and "retaliation" are the labels courts have used in describing an employee's claims under the Act. *See, e.g., O'Connor v. PCA Family Health Plan, Inc.,* 200 F.3d 1349, 1352 (11th Cir.2000). The relevant part of the Act, 29 U.S.C. § 2615(a), reads as follows:
> (1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
> (2) Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

[2] In this case, Plaintiff's Complaint does not specify which type of FMLA claim was alleged. Since the record is clear that Plaintiff was on paid STD leave for about seven weeks and did not suffer any adverse employment action until after at least another five weeks, summary judgment is appropriate for Defendants if the claim is one for interference with FMLA rights, since Plaintiff received more than twelve weeks of leave. Even though ultimately Plaintiff's effective termination from the payroll was

January 26, 2004, that termination did not take formally take place until several months later. Such later action cannot be construed as denying or preventing Plaintiff from taking her FMLA leave.

> FN8. The FMLA specifically allows employers to substitute accrued paid leave for the twelve unpaid weeks of FMLA leave. 29 U.S.C. § 2612(d)(2). The Eleventh Circuit has rejected as unenforceable the EEOC regulations requiring prospective notice by an employer to an employee regarding use of paid leave as FMLA leave. *McGregor v. Autozone, Inc.,* 180 F.3d 1305, 1308 (11th Cir.1999). The United States Supreme Court agreed with this conclusion in *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 90-91, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002). In other words, employers are free to substitute paid leave for FMLA leave, and need not give an additional 12 weeks of FMLA leave on top of accrued paid leave.

[3][4] Rather, Plaintiff's claim can be analyzed under the Title VII burden-shifting retaliation standard. *See Brungart v. BellSouth Telecommunications,* 231 F.3d 791, 799 (11th Cir.2000). In order to state a claim of retaliation based on indirect or circumstantial evidence, an employee must allege that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment decision; and (3) the decision was causally related to the protected activity. *Parris v. Miami Herald Publishing Co.,* 216 F.3d 1298, 1301 (11th Cir.2000). In this case, it is clear that Plaintiff availed herself of FMLA leave and suffered an adverse employment action by virtue of her termination. It is also clear that the termination was causally related to the protected activity, as the termination was based upon being absent from work or "inactive" for six months.

However, Defendant argues that the reason for termination, absence from work for six months, was caused by Plaintiff's failure to submit a fitness-for-duty certification to return to work pursuant to the FMLA. If uniformly-applied, federal law allows employers to require such certification. 29 C.F.R. § 825.310(a). Upon proper notice, which was given in writing in this case, an employer may terminate an employee who fails to provide certification "at the time FMLA leave is concluded." 29 C.F.R. § 825.311(c).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

356 F.Supp.2d 1306
356 F.Supp.2d 1306, 18 Fla. L. Weekly Fed. D 301, 10 Wage & Hour Cas.2d (BNA) 580
(Cite as: 356 F.Supp.2d 1306)

Page 6

[5][6][7] Plaintiff argues that the January 14, 2004 note from Dr. Demarchi, stating *1312 that Plaintiff prospectively may return to work in 4-6 weeks, is sufficient certification under the FMLA. The Court disagrees. Although the certification "itself need only be a simple statement of the employee's ability to return to work," according to 29 C.F.R. § 825.310(c), it must be relevant to the employees' condition at the time FMLA leave is concluded. Allowing a six-week old note to qualify as a fitness-for-duty certification would not be reasonable under the FMLA. At the other end of the timeline, Plaintiff's March 23, 2004 medical certification was submitted four weeks after her FMLA leave expired. Thus, neither the January 14 note nor the March 23 note legally qualify as a valid fitness-for-duty certification.

> FN9. The January 14, 2004 note could suffice as a "new medical certification for a serious health condition." See 29 C.F.R. § 825.311(c). In that case Plaintiff's FMLA leave should have extended until February 27, 2004. However, as noted above, Defendant did not take adverse action against Plaintiff until July, 2004. In addition, FMLA leave need not be paid leave. To the extent Plaintiff may have a claim for improper denial of STD benefits for the period from January 27, 2004 through February 27, 2004, such a claim, if any right to such benefits exists, would be a claim under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA"), not the FMLA.

Plaintiff relies upon Albert v. Runyon, 6 F.Supp.2d 57, 65-66 (D.Mass.1998), wherein a District Court held that the Postal Service may not conduct any type of Investigation into a medical certification that an employee may return to duty, unless there are other reasons, apart from the fact that FMLA leave was taken. In Albert, an employee who provided a certification to return to work was not reinstated by her employer until a medical examination was completed by the employer. The court determined that such a condition was not allowed under the FMLA. In the present case, Plaintiff never submitted a timely fitness-for-duty certification, thus the reasoning of Albert does not help Plaintiff's argument. Here, there was no valid fitness-for-duty certification.

> FN10. In Burton v. Neumann, 5 Wage & Hour Cas.2d (BNA) 1138, 1999 WL 973445 (S.D.Fla.), a case relied upon by Defendant, the Court granted summary judgment on an FMLA claim where a plaintiff did not submit the required return-to-duty certification.

Plaintiff also argues that there are factual disputes regarding what Ethan Allen employees may have orally told Plaintiff during February, 2004. Taking the facts in the light most favorable to Plaintiff, the fact that some statements may have been made by the store supervisors along the lines that Plaintiff should not worry about her job, or that Plaintiff was not told that the January 14, 2004 certification was insufficient are immaterial; Plaintiff was on written notice that a fitness for duty certificate was required and that documentation to explain the absence after January 26, 2004, should be sent to the corporate office. There is no dispute that a certification*1313 was not provided until March 23, 2004, with an effective date of March 23, 2004. This date is after the expiration of Plaintiff's FMLA leave, which expired on February 27, 2004.

> FN11. Plaintiff essentially argues that because Defendant did not communicate to her that a certification would be necessary at the time of reinstatement, she believed that she had complied with the certification requirement in the form of the January 14, 2004 note. However, it should have been clear to Plaintiff, based upon Defendant's actions, including letters from STD administrator Prudential dated February 4 (stating leave approved through January 4) and February 26 (stating leave approved through January 18), as well as Defendant's failure to approve her return to work during February, that the something else was required. After the March letters from Defendant to Plaintiff demanding to know her status finally triggered Plaintiff to obtain medical certification, the March 23, 2004 certification did not state that Plaintiff could have returned to work by February 26, 2004, the date her FMLA leave expired.

> FN12. Defendant urges that Court to consider that on March 22, 2004, Plaintiff wrote a medical hardship letter to Defendant's 401(k) administrator in support of a request to prematurely withdraw funds

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

356 F.Supp.2d 1306
356 F.Supp.2d 1306, 18 Fla. L. Weekly Fed. D 301, 10 Wage & Hour Cas.2d (BNA) 580
**(Cite as: 356 F.Supp.2d 1306)**

Page 7

without penalty. Exhibit 11 to Barnes Deposition. In the letter, Plaintiff describes her condition, including the need to "vomit aprox 3-4 times a week" and that she hopes to return to work in the next week or two. Defendant argues that this letter supports its argument that Plaintiff could not have returned to work before February 26, 2004. Plaintiff testified that this letter was describing her condition in January and early February, despite the use of present tense on March 22, 2004. The Court does not rely upon this exhibit in reaching the conclusions in this Order.

Returning to the burden-shifting analysis, Plaintiff has simply not presented any evidence to raise an inference that Defendant's offered explanation for her termination (Plaintiff's absence from work resulting from failure to submit medical certification of return to work) was mere pretext for the termination decision. Rather, it was a decision within the framework of the FMLA and its implementing regulations.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:
1. Defendant's Motion for Summary Judgment [DE 14] is hereby **GRANTED**;
2. Defendant's Motion for Sanctions [DE 36-2] is hereby **DENIED**;
3. The Court shall separately enter judgment for Defendant.

S.D.Fla.,2005.
Barnes v. Ethan Allen, Inc.
356 F.Supp.2d 1306, 18 Fla. L. Weekly Fed. D 301, 10 Wage & Hour Cas.2d (BNA) 580

Briefs and Other Related Documents (Back to top)

• 0:04CV61083 (Docket) (Aug. 17, 2004)
• 2004 WL 2093896 (Trial Pleading) Complaint (Aug. 13, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# H

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

Please use FIND to look at the applicable circuit court rule before citing this opinion. Eleventh Circuit Rule 36-2. (FIND CTA11 Rule 36-2.)

United States Court of Appeals,
Eleventh Circuit.
Tracy M. BARNES, Plaintiff-Appellant,
v.
**ETHAN ALLEN, INC.**, a foreign corporation, Defendant-Appellee.
**No. 05-11509**
**Non-Argument Calendar.**

Aug. 26, 2005.

**Background:** Employee brought suit against employer for violation of Family and Medical Leave Act (FMLA) regulations. The United States District Court for the Southern District of Florida, 356 F.Supp.2d 1306, Cohn, J., entered summary judgment for employer. Employee appealed.

**Holdings:** The Court of Appeals held that:
(1) doctor's note did not qualify as fitness for duty certificate, and
(2) record refuted contention that employee could have furnished proper fitness for duty certificate.
Affirmed.

West Headnotes

**[1] Labor and Employment 367(5)**
231Hk367(5) Most Cited Cases
Six-week-old note in which employee's doctor had stated that employee could return to work in four to six weeks did not qualify as fitness-for-duty certification under regulation allowing employers to require employees to provide such certification upon conclusion of leave under Family and Medical Leave Act (FMLA). Family and Medical Leave Act of 1993, § 2 et seq., 29 U.S.C.A. § 2601 et seq.; 29 C.F.R. § 825.311.

**[2] Labor and Employment 367(5)**
231Hk367(5) Most Cited Cases
Doctor's note stating that employee was incapacitated until date well beyond expiration of Family and Medical Leave Act (FMLA) precluded any determination that employee could have provided fitness for duty certificate at conclusion of 12-week leave under regulation allowing employers to require employees to provide such certification upon conclusion of leave. Family and Medical Leave Act of 1993, § 2 et seq., 29 U.S.C.A. § 2601 et seq.; 29 C.F.R. § 825.311.
**\*846** Appeal from the United States District Court for the Southern District of Florida. D.C. Docket No. 04-61083-CV-JIC.

Before BIRCH, BARKETT and COX, Circuit Judges.

PER CURIAM:

[1] Tracy M. Barnes appeals the judgment of the district court, arguing that it was error for the court to grant Ethan Allen, Inc.'s motion for summary judgment. We agree with the district court that the doctor's note provided to Barnes on January 14, 2004, does not qualify as a proper "fitness-for-duty certificate" under the Family and Medical Leave Act ("FMLA") regulations. See 29 C.F.R. § 825.311.

[2] Barnes's brief, construed liberally, arguably contends that Ethan Allen waived any right to a fitness-for-duty certificate. Implicit in this argument is a contention that Barnes could have furnished such a certificate if asked. The record, however, refutes this contention. The letter from Dr. Marchi submitted to Ethan Allen on March 23, 2004, states that Barnes was incapacitated and unable to work until March 23, 2004--a date well beyond the expiration of her twelve weeks of FMLA leave.

AFFIRMED.

149 Fed.Appx. 845

**Briefs and Other Related Documents (Back to top)**

• 05-11509 (Docket) (Mar. 18, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.